# United States Court of Appeals

*for the*

# Eighth Circuit

---

Case No. 24-3589

RHONDA BURNETT; JEROD BREIT;
JEREMY KEEL; FRANCES HARVEY; HOLLEE ELLIS,

*Plaintiffs-Appellees,*

– v. –

NATIONAL ASSOCIATION OF REALTORS;
HOME SERVICES OF AMERICA,

*Defendants-Appellees,*

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF MISSOURI

## BRIEF FOR DEFENDANT-APPELLEE
## NATIONAL ASSOCIATION OF REALTORS®

JOHN F. BASH
OWEN B. SMITHERMAN
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
300 W. Sixth Street, Suite 2010
Austin, Texas 78701
(737) 667-6100

CHRISTOPHER G. MICHEL
MICHAEL D. BONANNO
WILLIAM A. BURCK
RACHEL G. FRANK
SAMUEL HEAVENRICH
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
1300 I Street, N.W., Suite 900
Washington, DC 20005
(202) 538-8000

*Attorneys for Defendant-Appellee National Association of REALTORS®*

KELLER WILLIAMS REALTY, INC.; REALOGY HOLDINGS CORP.,

*Defendants,*

BHH AFFILIATES, LLC; HSF AFFILIATES, LLC,

*Defendants-Appellees,*

RE/MAX LLC,

*Defendant,*

– v. –

BROWN HARRIS STEVENS; THE AGENCY,

*Intervenors-Appellees,*

– v. –

HAO ZHE WANG,

*Interested Party-Appellant.*

# SUMMARY OF THE CASE

This case concerns a certified settlement class ("Class") of home sellers who alleged a conspiracy to inflate real estate brokerage commissions. Plaintiffs-Appellees are Rhonda Burnett and other home sellers ("Plaintiffs"), who brought the underlying suit in the U.S. District Court for the Western District of Missouri. Defendant-Appellee is the National Association of REALTORS® ("NAR"), which reached a settlement with the Class. Appellant is Hao Zhe Wang ("Wang"), who filed pro se objections to the settlement.

The district court overruled Wang's objections (along with others) and approved the settlement in a comprehensive opinion. Wang's pro se appeal contests various issues regarding the settlement approval, including the district court's factual findings, its jurisdiction to release certain claims, the adequacy of Class representation, purported racial discrimination in the settlement, and adequacy of Class notice. While NAR stands ready to present oral argument if the Court would find it useful, NAR believes this appeal can be resolved on the briefs and record.[1]

---

[1] Nineteen other objectors—all represented by counsel—have appealed the order approving the settlement, and the Court has consolidated those appeals. *See* Nos. 24-3444(L), 24-3450(C), 24-3451(C), 24-3527(C), 24-3585(C), 24-3619(C), 24-3621(C). NAR will file a separate brief in those appeals, and NAR expects that it will contend that oral argument is appropriate there. To facilitate judicial efficiency and consistent resolution of common issues, the Court should consider Wang's appeal in tandem with those appeals, even absent formal consolidation.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Local Rule 26.1A, NAR states that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT .............................................................2

STATEMENT OF THE ISSUE....................................................................3

STATEMENT OF THE CASE......................................................................3

    A.    Factual Background.........................................................3

    B.    Procedural History...........................................................4

    C.    Settlement.........................................................................6

    D.    Settlement Approval.......................................................10

SUMMARY OF ARGUMENT ...................................................................15

STANDARD OF REVIEW ........................................................................18

ARGUMENT ............................................................................................19

I.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN APPROVING THE CLASS SETTLEMENT .............................................19

    A.    The District Court Properly Certified The Settlement Class .............19

    B.    The District Court Properly Held That Sufficient Notice Was Provided To The Class ........................................................21

    C.    The District Court Properly Found That The Settlement Was Fair, Reasonable, And Adequate .........................................23

II.    WANG'S OBJECTIONS TO THE SETTLEMENT LACK MERIT...........25

    A.    The Settlement Treats Buyers Fairly................................26

    B.    The Opt-In Release Terms Are Clear And Unambiguous .................31

    C.    Wang's Objections To The Practice Changes Are Misplaced............34

    D.    The Settlement Notice Was Legally Sufficient....................35

    E.    Wang's Objections Related To Race And National Origin All Fail.........................................................................38

CONCLUSION ..........................................................................................41

**Cases**

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)................................................................21

*Blando v. Nextel Retail Stores,*
No. 02-cv-921 (W.D. Mo. filed Sept. 27, 2002)................................40

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013).............................................................19

*Davis v. Hanna Holdings, Inc.,*
2025 WL 845918 (E.D. Pa. Mar. 18, 2025) ....................................30

*DeBoer v. Mellon Mortg. Co.,*
64 F.3d 1171 (8th Cir. 1995) ..............................................20, 22

*DeHoyos v. Allstate Corp.,*
240 F.R.D. 269 (W.D. Tex. 2007) ............................................40

*Douglas v. U.S. Tobacco Co.,*
670 F.2d 791 (8th Cir. 1982) ...............................................33

*Dusenbery v. United States,*
534 U.S. 161 (2002)...........................................................22

*In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.,*
357 F.3d 800 (8th Cir. 2004) .......................................27, 28, 29

*Gibson v. NAR,*
No. 23-cv-788 (W.D. Mo. filed Oct. 31, 2023)........................6, 7, 14

*Grunin v. Int'l House of Pancakes,*
513 F.2d 114 (8th Cir. 1975) ...............................................21

*Huyer v. Njema,*
847 F.3d 934 (8th Cir. 2017) ...............................................25

*In re Hyundai & Kia Fuel Econ. Litig.,*
926 F.3d 539 (9th Cir. 2019)................................................21

*Keil v. Lopez*,
862 F.3d 685 (8th Cir. 2017) .............................................................30

*Leeder v. NAR*,
601 F. Supp. 3d 301 (N.D. Ill. 2022).................................................30

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*,
921 F.2d 1371 (8th Cir. 1990) ......................................................18, 24

*Marshall v. Nat'l Football League*,
787 F.3d 502 (8th Cir. 2015) ..........................18, 24, 25, 26, 31

*In re Milk Prods. Antitrust Litig.*,
195 F.3d 430 (8th Cir. 1999) ............................................................20

*Moehrl v. NAR*,
No. 19-cv-1610 (N.D. Ill. filed Mar. 6, 2019) ...................................6

*Petrovic v. Amoco Oil Co.*,
200 F.3d 1140 (8th Cir. 1999) .........................................................24

*Pierce v. Marsh*,
859 F.2d 601 (8th Cir. 1988) ...........................................................39

*Pigford v. Veneman*,
355 F. Supp. 2d 148 (D.D.C. 2005)..................................................40

*Pollard v. Remington Arms Co.*,
896 F.3d 900 (8th Cir. 2018) ......................................................22, 23

*Rawa v. Monsanto Co.*,
934 F.3d 862 (8th Cir. 2019) ..............................................18, 36, 40

*Rawa v. Monsanto Co.*,
No. 17-cv-1252 (E.D. Mo. filed Apr. 5, 2017)............................40, 41

*Stuart v. State Farm Fire & Cas. Co.*,
332 F.R.D. 293 (W.D. Ark. 2019) ....................................................37

*Sullivan v. Winn-Dixie Greenville, Inc.*,
62 F.R.D. 370 (D.S.C. 1974) ...........................................................39

*Thompson v. Edward D. Jones & Co.*,
  992 F.2d 187 (8th Cir. 1993) ...............................................................27

*In re TikTok, Inc., Consumer Priv. Litig.*,
  565 F. Supp. 3d 1076 (N.D. Ill. 2021) ................................................37

*Umpa v. NAR*,
  No. 23-cv-945 (W.D. Mo. Dec. 27, 2023) ...........................................7

*UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*,
  870 F.3d 856 (8th Cir. 2017) ...............................................................32

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
  716 F.3d 1057 (8th Cir. 2013) .......................................................23, 24

*Van Horn v. Trickey*,
  840 F.2d 604 (8th Cir. 1988) ..........................................3, 18, 24, 26

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ...................................................................29

*Wang v. NAR*,
  No. 24-cv-2371 (S.D.N.Y. filed Mar. 28, 2024) ...............................11

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
  396 F.3d 922 (8th Cir. 2005) ...............................................................40

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
  644 F.3d 604 (8th Cir. 2011) ...............................................................20

## Statutes

15 U.S.C. § 1 ..............................................................................................3, 5

15 U.S.C. § 15(a) ..........................................................................................5

28 U.S.C. § 1291 ..........................................................................................3

28 U.S.C. § 1331 ..........................................................................................3

28 U.S.C. § 1332(d) ......................................................................................2

Mo. Rev. Stat. § 407.025 ..............................................................................5

Mo. Rev. Stat. § 416.031 ........................................................................5

## **Rules**

Fed. R. Civ. P. 23 ..............................................2, 12, 14, 15, 18, 36

Fed. R. Civ. P. 23(a).................................................................15, 19

Fed. R. Civ. P. 23(a)(1)..................................................................19

Fed. R. Civ. P. 23(a)(2)..................................................................19

Fed. R. Civ. P. 23(a)(3)..................................................................20

Fed. R. Civ. P. 23(a)(4)............................................................20, 39

Fed. R. Civ. P. 23(b).................................................................15, 19

Fed. R. Civ. P. 23(b)(3)..........................................................19, 20, 21

Fed. R. Civ. P. 23(b)(3)(A)...............................................................21

Fed. R. Civ. P. 23(b)(3)(B)...............................................................21

Fed. R. Civ. P. 23(b)(3)(C)...............................................................21

Fed. R. Civ. P. 23(b)(3)(D)...............................................................21

Fed. R. Civ. P. 23(c)(2)..................................................................15

Fed. R. Civ. P. 23(c)(2)(B) ...................................................21, 22, 35, 36

Fed. R. Civ. P. 23(e)......................................................................3

Fed. R. Civ. P. 23(e)(2)........................................................16, 23, 24

**INTRODUCTION**

This pro se objector appeal seeks to undo a settlement providing significant relief to millions of home sellers nationwide and implementing robust practice changes. The settlement resulted from years of hard-fought litigation, including extensive discovery, a trial and jury verdict, thorough post-trial briefing and an expected appeal, and negotiations mediated by, among others, a federal magistrate judge and a retired district judge.

In return for release of claims, NAR agreed to provide substantial monetary relief to the Class in the form of a non-reversionary fund of $418 million. NAR further agreed to major practice changes addressing the Class's central legal claims. The settlement also provides a framework for hundreds of brokerages and Multiple Listing Services ("MLSs") to opt in, adopting the same significant practice changes and contributing substantial additional amounts of money to the settlement fund—over $30 million collectively. In light of the legal weaknesses in the case against NAR and the serious prospect of reversal on appeal, this was an enormously favorable result for the Class.

Although the Class includes millions of members, only 36, including Wang, objected to the settlement. Wang's principal argument is that the settlement is unfair to home buyers, whom he contends have potentially valuable direct-purchaser claims against NAR. As the district court correctly explained, that argument fails

for multiple independent reasons, including that the settlement does not release potential claims by buyers who did not also sell during the class period, provides significant compensation to buyers who did sell during the class period, and benefits all buyers through the required practice changes. Wang's theory that buyers directly purchase brokerage commissions also contradicts the factual record, the district court's express findings, and the decisions of other courts, all of which recognize that prior to the settlement, *sellers*—rather than buyers—paid brokerage commissions per the terms specified in listing agreements. Moreover, Wang could have pursued his putative buyer claims by opting out of the settlement, but he declined to do so.

Wang's other objections fare no better. His assertions of ambiguous release terms, inadequate practice changes, and insufficient notice were either forfeited by failure to raise them below or properly rejected by the district court after careful consideration. And his argument that the settlement reflects racial discrimination is entirely unsupported. In short, the district court properly applied Rule 23 and this Court's precedent in overruling Wang's objections and determining that the settlement is fair, reasonable, and adequate. The Court should accordingly affirm.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there is minimal diversity of citizenship

among the parties, the Class comprises more than 100 members, and the amount in controversy exceeds $5 million.  The district court also had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs alleged federal antitrust claims under the Sherman Act, 15 U.S.C. § 1.  The district court entered a final order approving the settlement on November 27, 2024, and Wang appealed on December 23, 2024.  This Court has jurisdiction over the district court's final order under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court permissibly exercised its discretion in approving the settlement after (1) finding that the settlement was fair, reasonable, and adequate under the factors specified by Federal Rule of Civil Procedure 23(e) and this Court's precedents, and (2) considering and rejecting all the objections raised by Wang.  *See* Fed. R. Civ. P. 23; *Van Horn v. Trickey*, 840 F.2d 604, 606–07 (8th Cir. 1988).

## STATEMENT OF THE CASE

### A.    Factual Background

When a homeowner sells a home to a buyer, the seller and buyer generally each retain their own brokers.  As compensation for services, the seller-broker may receive a commission, often calculated as a percentage of the home sale price.  The seller-broker's commission is set out in the home's listing agreement (the contract between the seller and seller-broker), which generally provides that the seller-broker will share the commission with the buyer-broker.  R. Doc. 963-49, at 5; R. Doc. 1019, at 3.  The buyer and buyer-broker agree to a similar contract, which typically

provides for the buyer-broker's compensation to be paid from the seller-broker's commission upon sale.  R. Doc. 741, at 3.  Thus, when a buyer purchases a home, the buyer pays the seller, who pays a commission to the seller-broker, who pays a portion of that commission to the buyer-broker.

Most home transactions in the United States are facilitated through an MLS, a database of properties listed for sale in a given geographic region.  R. Doc. 741, at 3.  Seller-brokers and buyer-brokers use the MLS to publish and search for property listings, respectively.  R. Doc. 1019, at 3.  To list a property on an MLS, the seller-broker must participate in the MLS and abide by its rules.  R. Doc. 1019, at 4. NAR—a national trade association of licensed real estate brokers and agents, known as REALTORS®—requires that any NAR-affiliated MLS comply with NAR's governing rules, which include the MLS Handbook and Code of Ethics.  R. Doc. 741, at 3–4.  In 1996, NAR adopted a rule requiring seller-brokers to make offers of compensation to buyer-brokers for each MLS listing.  R. Doc. 1019, at 4.

## B.    Procedural History

Plaintiffs—sellers who paid broker commissions in connection with the sale of residential real estate listed on one of four MLSs in Illinois, Kansas, and Missouri—commenced this litigation in the Western District of Missouri in April 2019.  R. Doc. 1, at 1.  They claimed that NAR and four real estate broker franchisors

(collectively "Defendants")[2] violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by enforcing anticompetitive rules that require seller-brokers to compensate buyer-brokers and that allegedly inflated buyer-brokers' commissions. R. Doc. 759, at 1–2.[3]

The district court denied Defendants' motions to dismiss Plaintiffs' claims in October 2019. R. Doc. 131. The court certified a class of persons who, beginning in April 2015, paid a commission to a buyer-broker in connection with the sale of a home through the specified MLSs in Illinois, Kansas, and Missouri. R. Doc. 741, at 40. The parties conducted years of extensive discovery, much of it focused on the nationwide rules and practices of NAR and its members. R. Doc. 1595-2, at 8 (¶ 16).

The district court denied Defendants' motions for summary judgment in December 2022. R. Doc. 1019. The case went to trial in October 2023. R. Doc. 1244. The jury ruled against Defendants, awarding the Class nearly $1.8 billion in damages, R. Doc. 1294, at 2, subject to trebling, 15 U.S.C. § 15(a). Defendants filed

---

[2]    The franchisors are HomeServices of America, Inc. (including its subsidiaries BHH Affiliates, LLC and HSF Affiliates, LLC), Anywhere Real Estate Inc. (formerly Realogy Holdings Corp.), RE/MAX LLC, and Keller Williams Realty, Inc. R. Doc. 759, at 1–2.

[3]    Plaintiffs initially also alleged violations of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.025; and the Missouri Antitrust Law, Mo. Rev. Stat. § 416.031, but Plaintiffs dropped those state law counts before trial, leaving only the federal antitrust count. R. Doc. 1227; *see* R. Doc. 759, at 2.

post-trial motions arguing that, *inter alia*, Plaintiffs lacked standing to bring the suit because they did not purchase directly from Defendants, NAR's rule was not an unreasonable restraint of trade, there was insufficient evidence of a conspiracy between NAR and the other Defendants, and Plaintiffs relied on a flawed damages theory. *See* R. Docs. 1360, 1362, 1386, 1388.

### C. Settlement

While discovery, motion practice, trial, and post-trial briefing proceeded, Plaintiffs and NAR engaged in extensive arm's-length settlement negotiations for nearly four years, including "several telephonic and in-person mediations with a nationally recognized and highly experienced mediator, two mediations with a retired federal court judge, and a mediation with a federal magistrate judge." R. Doc. 1595-1, at 6 (¶ 19). The parties reached agreement after the verdict and submission of post-trial briefing, and both sides considered the risks and costs of continued litigation, including reversal of the verdict in this case on appeal, the potential bankruptcy of NAR if the verdict were affirmed, and other suits filed both before and after the verdict—several of which involved nationwide classes asserting similar claims. R. Doc. 1595-2, at 7, 11 (¶¶ 15, 27).[4]

---

[4] Plaintiffs in the Northern District of Illinois brought a class action in 2019 for homes listed on 20 MLSs across the country. Complaint, *Moehrl v. NAR*, No. 19-cv-1610 (N.D. Ill. Mar. 6, 2019). Plaintiffs brought two class actions in the Western District of Missouri on behalf of nationwide classes. Complaint, *Gibson v.*

The settlement Class encompasses all persons who sold a home listed on an MLS in the United States in which a commission was paid to a brokerage in connection with the sale of the home during the Class period. R. Doc. 1622, at 4–5 (¶ 8); Add. 4–5. The Class period varied depending on the location of the home, ranging between April 29, 2014, and October 31, 2019, as the commencement date, to August 17, 2024, as the end date. R. Doc. 1622, at 1, 4–5 (¶ 8); Add. 1, 4–5.

In return for release of the Class members' claims, NAR agreed to pay $418 million into a non-reversionary settlement fund for the benefit of the Class. R. Doc. 1458-1, at 21, 31 (¶¶ 24, 46). In addition, the agreement requires NAR to make several significant practice changes. NAR must eliminate any existing requirements that "listing brokers or sellers must make offers of compensation to buyer brokers or other buyer representatives (either directly or through buyers)" or that compensation "offers, if made, must be blanket, unconditional, or uniliteral." R. Doc. 1458-1, at 35 (¶ 58(i)). NAR must also eliminate and prohibit any requirements conditioning MLS participation or membership "on offering or accepting offers of compensation to buyer brokers or other buyer representatives." R. Doc. 1458-1, at 36 (¶ 58(iv)). And NAR must prohibit anyone using an MLS from making cooperative compensation offers on the MLS. R. Doc. 1458-1, at 36 (¶ 58(ii)(a)).

---

*NAR*, No. 23-cv-788 (W.D. Mo. Oct. 31, 2023); Complaint, *Umpa v. NAR*, No. 23-cv-945 (W.D. Mo. Dec. 27, 2023).

The practice changes further require increased pricing transparency to buyers and sellers. As to buyers, buyer-brokers participating in an MLS must enter into a written agreement that "conspicuously disclose[s] the amount or rate of compensation" the broker will receive "from any source" before touring a home with a buyer. R. Doc. 1458-1, at 37 (¶ 58(vi)(a)). And buyer-brokers "may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer." R. Doc. 1458-1, at 37 (¶ 58(vi)(c)). As to sellers, seller-brokers must "conspicuously disclose" and obtain advance approval from sellers for "any payment or offer of payment that the listing broker or seller will make to another broker, agent, or other representative (e.g., a real estate attorney) acting for buyers" and must "specify the amount or rate of any such payment." R. Doc. 1458-1, at 37 (¶ 58(viii)).

NAR must also generally prohibit REALTORS® "from representing to a client or customer that their brokerage services are free or available at no cost to their clients" and must require them to "disclose to prospective sellers and buyers in conspicuous language that broker commissions are not set by law and are fully negotiable." R. Doc. 1458-1, at 37–38 (¶ 58(vii), (ix)). And NAR must adopt additional rules prohibiting "steering," that is, prohibiting REALTORS® from "filter[ing] out or restrict[ing] MLS listings communicated to their customers or

clients based on the existence or level of compensation offered . . . ." R. Doc. 1458-1, at 38 (¶ 58(x)).

The agreement contains an opt-in framework permitting brokerages and MLSs to obtain a release of liability from the Class in exchange for agreeing to the substantive provisions of the settlement agreement. R. Doc. 1458-1, at 14–18 (¶ 18(b)–(f)). Specifically, opt-in entities must adopt the same significant practice changes as NAR; agree to provide proof of compliance if requested by Plaintiffs' counsel; and cooperate with Plaintiffs and Class members to produce documents, witnesses, and data. Thus far, brokerages that have opted into the settlement have contributed substantial additional amounts of money—over $30 million collectively—to the settlement fund. R. Doc. 1458-1, at 14–18, 36–38, 42–46 (¶¶ 18(b)–(f), 58(vi)–(x), 66–68); *see also* R. Doc. 1622, at 22 (¶ 44); Add. 22 (explaining the opt-in structure); R. Doc. 1458-1, at 58–116 (opt-in agreement forms); R. Doc. 1595-2, at 6 (¶ 11) (opt-in payments). The agreement further provides that the district court retains jurisdiction over the settlement and its interpretation and enforcement. R. Doc. 1458-1, at 43 (¶ 82); R. Doc. 1622, at 87 (¶ 191); Add. 87.

Importantly for purposes of the appeal, the agreement does not release the claims of individuals who did not *sell* a home during the Class period; thus, potential plaintiffs who exclusively *bought* homes during the Class period may continue to

assert claims.  R. Doc. 1458-1, at 20 (¶ 21).  Class members' potential claims "concerning product liability, breach of warranty, breach of contract or tort of any kind (other than a breach of contract or tort based on any factual predicate in the Actions)" are likewise preserved.  R. Doc. 1458-1, at 26 (¶ 36).  So are any Class member's claims "against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in the Actions."  R. Doc. 1458-1, at 26–27 (¶ 36).

### D.    Settlement Approval

#### 1.    Notice And Preliminary Approval

In April 2024, the district court preliminarily approved the settlement between the Class and NAR.  R. Doc. 1460.  Over the next few months, JND Legal Administration—the settlement administrator—disseminated notice of the settlement to Class members through first-class U.S. mail, e-mail, and digital and print publications.  R. Doc. 1595-7, at 3–13 (¶¶ 3–48).  JND sent postcard notices to over 14 million addresses and e-mail notices to nearly 26 million addresses.  R. Doc. 1595-7, at 6–7 (¶¶ 16, 19).  Out of the millions of Class members, only 39 requested exclusion from the agreement and only 36 (including Wang) objected.  R. Doc. 1595-7, at 15 (¶ 57); R. Doc. 1622, at 3 (¶ 4); Add. 3; *see* R. Doc. 1547 (Wang objection).

In addition to the extensive direct notice program, JND also implemented a comprehensive digital and electronic media notice program which reached over 70% of the Class.  R. Doc. 1595-7, at 7–12 (¶¶ 22–40).  The digital portion of the media effort alone resulted in more than 308 million impressions.  R. Doc. 1595-7, at 7–8 (¶ 22).  The media notice program also included a press release that resulted in over 500 news stories with an additional 176.7 million potential viewers.  R. Doc. 1595-7, at 10 (¶ 34).  Combined, the notice programs reached over 99% of the Class.  R. Doc. 1595-7, at 12 (¶ 40).  JND also established and maintained a website that had over 2 million unique visitors and over 12 million page views, and operated a dedicated toll-free number that received over 110,000 calls.  R. Doc. 1595-7, at 13 (¶¶ 44, 46).

In October 2024, the district court granted preliminary approval to certain non-NAR MLSs and brokerages that opted into the settlement.  R. Doc. 1540.

## 2.    Wang's Parallel Suit and Objections

After the jury verdict in this case, Wang filed a pro se suit in the Southern District of New York challenging the same NAR rules.  Complaint, *Wang v. NAR*, No. 24-cv-2371 (S.D.N.Y. Mar. 29, 2024).  Over Wang's opposition, that court stayed Wang's action pending resolution of the proceedings in this case.  Order, *Wang v. NAR*, No. 24-cv-2371 (S.D.N.Y. Jan. 23, 2025).  Wang initially indicated that he might opt out of the settlement in this case in order to continue his suit, Wang

Add. 67–68, 74, but he ultimately filed objections to the settlement, R. Doc. 1547, at 1–3.

### 3.  Final Approval

On November 26, 2024, the district court held a final approval hearing during which several individuals—including Wang—presented their objections to the settlement.  R. Doc. 1640.  Wang spoke at length at the hearing, emphasizing his belief that the settlement provides inadequate relief to home buyers and should not release their claims.  R. Doc. 1640 at 50–58.

On November 27, 2024, the court granted final approval of the settlement.  R. Doc. 1622; Add. 1.  In an exhaustive 88-page opinion, the court reviewed the procedural requirements for settlement approval under Rule 23 and this Court's precedent and determined that the agreement met each procedural requirement.  R. Doc. 1622, at 2–7 (¶¶ 2–15); Add. 2–7.  The court further determined that the settlement met the substantive requirements for approval:  After evaluating, *inter alia*, the adequacy of Class representatives and Class counsel, the negotiation process, the relief provided and its method of distribution, how the settlement treats Class members relative to each other, the attorneys' fee request, the strengths and weaknesses of each side's case, NAR's financial condition, the complexity and expense of further litigation, and the overwhelming approval of the settlement

among Class members, the court found that the agreement is "fair, reasonable, and adequate." R. Doc. 1622, at 7–15 (¶¶ 16–32); Add. 7–15.

The court then thoroughly considered and rejected each objection to the settlement. R. Doc. 1622, at 15–77 (¶¶ 33–165); Add. 15–77. Regarding Wang's objections, the court first noted that several of them—concerning inflated broker commissions, buyer-brokers marketing their services as free, the limited negotiations surrounding commissions, and less-than-full disclosure to home sellers and buyers of commission rates—are addressed by the settlement, and thus "support approving the Agreement, not rejecting it." R. Doc. 1622, at 70–71 (¶ 148); Add. 70–71. The court rejected Wang's argument that buyer claims should not be released, noting that (1) the settlement does not release the claims of Class members who only bought—and never sold—a home during the Class period; and (2) because the remaining Class member buyer claims arise from the same factual predicate as claims by sellers, it was not necessary to carve out or create a subclass for buyer claims. The court accordingly determined that the settlement's release of buyer claims was proper. R. Doc. 1622, at 71 (¶¶ 150–51); Add. 71.

The court found no evidence to substantiate Wang's claims that seller-brokers may not submit offers from buyers unrepresented by buyer-brokers, that the settlement is racially discriminatory, or that the settlement amount is either too low or too high. R. Doc. 1622, at 72–73 (¶¶ 153, 155–56); Add. 72–73.

The court also found that, contrary to Wang's assertions, the agreement does not require buyers to retain buyer-brokers, the non-reversion requirement will benefit Class members, the class notice satisfies the requirements of Rule 23 and due process, and the agreement's release provision is clear and unambiguous. R. Doc. 1622, at 73–77 (¶¶ 157–65); Add. 73–77.

### 4. Further Proceedings

After final approval, Wang moved for reconsideration and for an evidentiary hearing regarding JND's dissemination of the settlement notice. R. Doc. 1633. The court denied the motion. R. Doc. 1637; Add. 89. Wang appealed. R. Doc. 1658.[5]

---

[5] Nineteen other objectors also appealed the district court's approval of the NAR settlement. *See* note 1, *supra*. Those appeals have been consolidated and are simultaneously pending before this Court. *See id.* The district court also approved a settlement between the Class and HomeServices, *see* R. Doc. 1674, and some objectors to that settlement have appealed as part of the same consolidated appeals challenging the settlement in this case, *see, e.g.*, Nos. 24-3444(L), 24-3527(C), 24-3619(C). In addition, the district court approved settlements between the Class and several real estate companies including Compass, Inc. and Redfin Corporation. Order, *Gibson v. NAR*, No. 23-cv-788 (W.D. Mo. Nov. 4, 2024). Objectors to those settlements filed appeals that are docketed at Nos. 24-3473(L), 24-3478(C), 24-2481(C), and 24-3564(C), and for which briefing is ongoing. Finally, the district court approved settlements between the Class and franchisors Anywhere Real Estate, RE/MAX, and Keller Williams. R. Doc. 1487. Objectors to those settlements have appealed, and those appeals have been fully briefed separately before this Court. Nos. 24-2143(L), 24-2168(C), 24-2391(C).

# SUMMARY OF ARGUMENT

The Court should affirm the district court's order because the court committed no legal errors and acted well within its broad discretion in entering final approval of the settlement and rejecting Wang's objections.

**I.** The district court did not abuse its discretion in certifying the Class for settlement, approving the Class notice procedures, and determining that the settlement was fair, reasonable, and adequate.

**A.** The district court properly certified the Class for settlement under Rule 23. The nationwide Class of home sellers who paid broker commissions and allege that Defendants conspired to inflate those commissions in violation of federal antitrust law satisfies the numerosity, commonality, typicality, and adequate-representation requirements of Rule 23(a). In addition, the common question of an alleged unlawful conspiracy predominated over individual questions and the settlement was a superior method of relief for Class members, satisfying Rule 23(b).

**B.** The district court also properly held that the Class notice satisfied Rule 23(c)(2) and due process. The class administrator sent tens of millions of direct notices and engaged in an extensive supplemental print and digital campaign, ultimately reaching over 99% of potential Class members—a degree of notice that readily meets (and far surpasses) the required standard.

**C.** Finally, the district court properly found that the Class settlement was fair, reasonable, and adequate. The court exhaustively walked through all of the Rule 23(e)(2) and *Van Horn* factors, finding that the settlement—$418 million from NAR and $30 million from opt-in entities, plus significant practice changes—was satisfactory; the Class representatives and counsel were adequate advocates for the Class; the Class members were treated equally; the settlement resulted from contested, arm's-length negotiations; the settlement avoided future complications and expense; and the amount of Class opposition was minimal.

**II.** Wang's objections to the settlement lack merit.

**A.** Wang contends that the settlement is unfair to home buyers because it releases what he characterizes as valuable direct purchaser claims by buyers against NAR. But the potential claims of buyers who did not sell homes during the Class period are not released by the settlement, and buyers who did sell homes during the Class period are entitled to significant relief under the settlement. In addition, the buyer claims Wang touts arise from the same factual predicate as the seller claims in this suit, so the buyer claims are properly released regardless of whether they are characterized as direct or indirect purchaser claims. In any event, the district court expressly found that sellers—not buyers—pay brokers, undermining Wang's theory that buyers are direct purchasers. Finally, if Wang believes that his buyer claims were worth more, he could have opted out of the settlement.

**B.** Wang contends that the settlement's provision releasing certain non-NAR MLSs, Paragraph 18(d), is ambiguous. But that objection is waived because Wang did not raise it below. Regardless, it is meritless because Wang confuses conditionality with ambiguity. Paragraph 18(d) provides in clear terms that certain non-NAR MLSs may opt into the settlement by contributing to the settlement fund and agreeing to the practice changes. Such conditional releases are familiar and widely accepted by courts. And even if (contrary to precedent) identification of a precise list of opt-ins were required, Class members had access to such a list before the opt-out deadline.

**C.** Wang criticizes the practice changes required by the settlement as inadequate. But as the district court properly found, those changes directly address the alleged injury that formed the basis of this suit. Wang's arguments about problems with implementation and enforcement are speculative and premature.

**D.** Wang claims that the notice program was inadequate and the opt-out procedure lacked due process. But his arguments are undermined by the success of the notice program, which sent out tens of millions of direct notices and reached over 99% of potential Class members, and the fact that courts have repeatedly approved the same opt-out procedures for class actions.

**E.** Wang levies arguments about discrimination or lack of representation on the basis of race or national origin. But neither the settlement nor the notice program

discriminated on these bases or any other basis, there is no evidence of disparate impact, and the race of the Class representatives is not relevant to Rule 23.

## STANDARD OF REVIEW

A settlement agreement is "presumptively valid." *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d 1371, 1391 (8th Cir. 1990). "Only upon the clear showing that the district court abused its discretion will this court intervene to set aside a judicially approved class action settlement." *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) (citation omitted). The same deferential abuse-of-discretion standard applies to a district court's decision to certify a settlement class. *See Rawa v. Monsanto Co.*, 934 F.3d 862, 869 (8th Cir. 2019). This Court accords "[g]reat weight" to the district judge's views because he or she "is exposed to the litigants, and their strategies, positions and proofs." *Van Horn*, 840 F.2d at 606 (citation omitted). "Mindful of the limited scope" of its review, this Court asks "whether the District Court considered all relevant factors, whether it was significantly influenced by an irrelevant factor, and whether in weighing the factors it committed a clear error of judgment." *Marshall*, 787 F.3d at 508 (cleaned up).

## ARGUMENT

## I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN APPROVING THE CLASS SETTLEMENT

### A. The District Court Properly Certified The Settlement Class

Class certification requires the satisfaction of Rule 23(a) and one of the provisions of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). The four requirements of Rule 23(a) are numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). As relevant here, satisfying Rule 23(b)(3) requires that common questions of law or fact "predominate over any questions affecting only individual members" and the class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3). The district court correctly found that the settlement Class satisfied Rule 23(a) and (b)(3). *See* R. Doc. 1622, at 5 (¶¶ 10–11); Add. 5.

The Class met the four requirements of Rule 23(a). The Class includes, *inter alia*, anyone who, over a period of five to ten years, sold a home on an MLS in the United States where a commission was paid to any brokerage in connection with that sale. *See* R. Doc. 1622, at 5 (¶ 9); Add. 5. As the district court recognized, this includes "millions of home sellers" spread out across the country, R. Doc. 1622, at 46 (¶ 95); Add. 46, making the "joinder of all members . . . impracticable," Fed. R. Civ. P. 23(a)(1). There are several "questions of law or fact common" to the Class, Fed. R. Civ. P. 23(a)(2), including whether NAR and other defendants engaged in

the alleged conspiracy to artificially inflate the cost of commissions in residential real estate transactions in violation of federal antitrust law, *see* R. Doc. 741, at 10–11; R. Doc. 1622, at 5 (¶ 10); Add. 5. Class representatives brought claims "typical" of the Class, Fed. R. Civ. P. 23(a)(3), as each sold a home listed on an American MLS and paid a commission allegedly inflated by the conduct of NAR and other Defendants, R. Doc. 741, at 13–14; *see DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) ("The burden of demonstrating typicality is fairly easily met."). Finally, the Class representatives "fairly and adequately" protected the interests of the Class. Fed. R. Civ. P. 23(a)(4). Class representatives sought the same relief and were subject to no unique defenses, underscoring their adequacy and typicality. *See In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999). There were no identified conflicts between Class representatives and the Class, nor any indication "that the claims were not vigorously pursued." *DeBoer*, 64 F.3d at 1174; *see* R. Doc. 1622, at 6, 9–10 (¶¶ 12, 21); Add. 6, 9–10.

The Class also met the requirements of Rule 23(b)(3). The issue of the alleged conspiracy to inflate commissions in violation of the Sherman Act "predominate[s]" over questions that only affect individual members, Fed. R. Civ. P. 23(b)(3), as all Class members sold homes and paid commissions that they allege were affected by the same NAR rules, *see* R. Doc. 1622, at 5 (¶ 11); Add. 5; *see In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 619 (8th Cir. 2011) (explaining that

common questions of law or fact predominated where they were "capable of resolution through common evidence"); *see also In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 559 (9th Cir. 2019) (finding predominance where a "cohesive group of individuals suffered the same harm in the same way because of the [defendants'] alleged conduct").

The relevant Rule 23(b)(3) factors also demonstrate the "superior[ity]" of class resolution over "other available methods." Fed. R. Civ. P. 23(b)(3). The low expected recovery creates little incentive for plaintiffs to sue individually, *see* R. Doc. 1622, at 38 (¶ 79); Add. 38; Fed. R. Civ. P. 23(b)(3)(A); there were few lawsuits filed by Class members (even counting copycat lawsuits filed after preliminary approval), *see* R. Doc. 1622, at 41 (¶¶ 83–84); Add. 41; Fed. R. Civ. P. 23(b)(3)(B); and a nationwide class action "achieve[s] economies of time, effort, and expense," *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615-16 (1997) (quotation omitted); Fed. R. Civ. P. 23(b)(3)(C); *see also Amchem*, 521 U.S. at 620 (Rule 23(b)(3)(D) not relevant in settlement context). Because the Class satisfied Rule 23(a) and (b)(3), certification for settlement was proper.

### B. The District Court Properly Held That Sufficient Notice Was Provided To The Class

Notice of a Rule 23(b)(3) class settlement must comply with both Rule 23(c)(2)(B) and due process. *See Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 120 (8th Cir. 1975). The former requires "the best notice that is practicable under

the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The latter likewise requires notice "'reasonably calculated' to apprise a party of the pendency of the action." *Dusenbery v. United States*, 534 U.S. 161, 170 (2002) (citation omitted). As relevant to this case, neither provision requires actual notice to 100% of the Class. *See Pollard v. Remington Arms Co.*, 896 F.3d 900, 906 (8th Cir. 2018).

The district court properly found that notice reached the vast majority of potential Class members, satisfying the requirements of Rule 23(c)(2)(B) and due process. *See* R. Doc. 1622, at 3 (¶ 5); Add. 3. The notice program was constructed and implemented by JND, a legal administration services provider that has administered notices in several major class action settlements. *See* R. Doc. 1595-7, at 21–32 (listing engagements). Having collected contact information from NAR, other Defendants, and a third-party aggregation service, JND sent out nearly 26 million e-mail notices and over 14 million postcard notices. *See* R. Doc. 1595-7, at 4, 6–7 (¶¶ 5, 16, 19). JND also engaged in a massive digital and online campaign using Google Search and Facebook, distributed a press release to over 6,000 English and Spanish media outlets, and published a print notice in *Better Homes & Gardens* magazine. *See* R. Doc. 1595-7, at 7–11 (¶¶ 22–39). This program far exceeded what this Court has previously approved as sufficient notice. *E.g.*, *DeBoer*, 64 F.3d at

1176 (affirming district court approval of settlement when "[e]ach class member was notified by mail and notice was also printed in a national publication").

The ultimate result is that the direct notice program reached over 97.5% of potential Class members, R. Doc. 1595-7, at 7 (¶ 21), and the total reach was over 99% of potential Class members, *see* R. Doc. 1595-7, at 12 (¶ 40); R. Doc. 1622, at 3 (¶ 2); Add. 3. That readily suffices to constitute sufficient notice under this Court's precedents. *See, e.g.*, *Pollard*, 896 F.3d at 906–07 (affirming district court approval of class action settlement with notice that reached between 49% and 73.7% of class members); *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1061 (8th Cir. 2013) (same, where notice reached 70.02% of homeowner class).

### C. The District Court Properly Found That The Settlement Was Fair, Reasonable, And Adequate

Rule 23(e)(2) factors prescribes four factors to consider in determining whether a class action is "fair, reasonable, and adequate": whether (A) the class representatives and class counsel "have adequately represented the class"; (B) the proposal was "negotiated at arm's length"; (C) the relief provided for the class is "adequate"; and (D) the agreement treats class members "equitably relative to each other." Fed. R. Civ. P. 23(e)(2). In this Circuit, courts also considers the four overlapping *Van Horn* factors: "(1) the merits of the plaintiff's case weighed against the terms of the settlement, (2) the defendant's financial condition, (3) the

complexity and expense of further litigation, and (4) the amount of opposition to the settlement." *Uponor*, 716 F.3d at 1063 (cleaned up) (quoting *Van Horn*, 840 F.2d at 607). This Court has repeatedly emphasized that "[t]he law strongly favors settlements," which are "presumptively valid." *Little Rock*, 921 F.2d at 1383, 1391; *see, e.g.*, *Marshall*, 787 F.3d at 508 (citation omitted); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999).

The district court thoroughly considered and properly found that all of the Rule 23(e)(2) and *Van Horn* factors weigh in favor of the settlement. *See* R. Doc. 1622, at 8–15 (¶¶ 17–32); Add. 8–15. As to Rule 23(e)(2), the Class representatives were adequate, *see* R. Doc. 1622, at 6, 9–10 (¶¶ 12, 21); Add. 6, 9–10; Class counsel won a large (if legally unsupported) jury verdict, with no conflicts of interest or collusion with Defendants' counsel, and were thus also adequate, *see* R. Doc. 1622, at 9–10 (¶ 21); Add. 9–10; settlement negotiations were lengthy, adversarial, and at arm's length, *see* R. Doc. 1595-1, at 6 (¶ 19); R. Doc. 1622, at 10 (¶ 22); Add. 10; the Class settlement—including $418 million and significant practice changes—was more than adequate, R. Doc. 1622, at 10–11, 14 (¶¶ 23, 29); Add. 10–11, 14; and Class members were treated equally, with practice changes covering all Class members and every Class member eligible to submit a claim and receive monetary compensation, *see* R. Doc. 1622, at 12 (¶ 26); Add. 12.

As to the *Van Horn* factors, Class members achieved substantial and immediate relief despite what even Class counsel acknowledged as "serious attacks to the jury verdict" that NAR was "poised to mount" post-trial and on appeal. R. Doc. 1595-1, at 7 (¶ 22); *see* R. Doc. 1622, at 10–11, 13 (¶¶ 23, 28); Add. 10–11, 13; *Huyer v. Njema*, 847 F.3d 934, 939 (8th Cir. 2017) (emphasizing the relevance of "credible defenses"). The $418 million that NAR agreed to pay represents a significant percentage of its assets, R. Doc. 1597, at 8; further litigation was certain to be complex and expensive, *see* R. Doc. 1622, at 14 (¶ 30); Add. 14 ("The Court has observed first-hand the complexity and expense of the litigation."); and there was almost no opposition, with only a small number of opt-outs and objections compared to almost half a million submitted claims (as of November 27, 2024) and tens of millions of potential class members, *see* R. Doc. 1595-7, at 15 (¶¶ 56–57); R. Doc. 1622, at 3 (¶ 4); Add. 3; *see Marshall*, 787 F.3d at 508, 513 (finding opposition "not substantial" when eight percent of class members opted out).

## II. WANG'S OBJECTIONS TO THE SETTLEMENT LACK MERIT

The district court carefully considered and properly rejected each of Wang's objections. As the court recognized, the settlement treats buyers fairly by allowing buyers who did not sell during the Class period to pursue potential claims separately and providing significant relief to buyers who also sold during the Class period. The settlement also provides clear direction about potential opt-ins, requires meaningful

practice changes, and was the subject of ample notice to the Class. Finally, Wang's claims about alleged discrimination or lack of representation lack evidentiary and legal support. Particularly given the district court's broad discretion to approve class action settlements, *see Marshall*, 787 F.3d at 508; *Van Horn*, 840 F.2d at 606–07, the court's rejection of Wang's objections should be readily affirmed.

## A. The Settlement Treats Buyers Fairly

Wang's principal argument is that the settlement should not have been approved because it treats buyers unfairly. Specifically, he asserts that buyers hold valuable direct-purchaser claims that are improperly released by the settlement. Br. 26–37. The district court correctly explained that Wang's contention fails for multiple independent reasons. R. Doc. 1622, at 59–72 (¶¶ 127–45, 148–54); Add. 59–72.

As a threshold matter, the "Settlement Class" includes only individuals who, among other criteria, "*sold* a home" within the Class period. R. Doc. 1458-1, at 20 (¶ 21) (emphasis added). Buyers who did not sell homes during the Class period accordingly "are not Settlement Class members" and "have released nothing." R. Doc. 1622, at 62 n.16; Add. 62; *see* R. Doc. 1622, at 60, 66, 71 (¶¶ 129, 141, 150); Add. 60, 66, 71 (same).

Moreover, the settlement provides significant relief to buyers who *did* sell homes during the Class period. Such buyers benefit from the practice changes,

which are designed to promote transparency and competition in commissions by eliminating the requirement that seller-brokers make unilateral or unconditional offers to split commissions with buyer-brokers. *See* R. Doc. 1458-1, at 35 (¶ 58(i)); R. Doc. 1622, at 24–25 (¶¶ 49–50); Add. 24–25. In addition, buyers who also sold during the Class period are members of the Class entitled to compensation from the settlement fund. *See* R. Doc. 1622, at 63 (¶ 135); Add. 63 ("[E]very Class member sold a home and therefore will receive compensation."); R. Doc. 1622, at 64 (¶ 137); Add. 64 ("Every Class member stands to gain from the settlements, both in terms of money and injunctive relief."). Such buyers' claims are properly released because, as Wang acknowledges, class settlements may release claims that arise out of the same factual predicate as the pleaded claims, Br. 35, even claims not "specifically pleaded," *In re General American Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004). This Court has long endorsed this principle. *See Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 190–91 & n.6 (8th Cir. 1993).

Wang's buyer claims arise from the same facts as the seller claims brought in this suit regardless of whether they are characterized as direct or indirect purchaser claims. Wang's claims challenge the same NAR rules Plaintiffs challenge, rely on the same alleged conspiracy, and seek relief from same alleged harm: inflated broker commissions. Wang argues that his buyer claims were released for no consideration in violation of due process. Br. 36–37. But as the district court recognized,

"[h]aving properly limited the scope of the releases based on the 'same factual predicate' standard," the parties had "no further obligation to assign separate settlement values to every distinct claim that Class members might have asserted." R. Doc. 1622, at 60 (¶ 130); Add. 60.

Wang's claim that lack of commonality between seller and buyer interests should have precluded class certification, Br. 37–39, fails for the same reason. The Class representatives were also home buyers, and they had the same interest and objective as their fellow Class members: ending Defendants' alleged anticompetitive conspiracy and recovering the purportedly excessive commissions paid. The release of buyer claims based on that common factual predicate in this case parallels the release of claims approved by this Court in *General American*. There, the plaintiff argued that the class representatives did not adequately represent her or others with "modal-billing claims," a subset of the claims resolved in the class action, because class members "received nothing for their modal-billing claims." 357 F.3d at 803, 805. This Court rejected the contention "that modal-billing claims were given away for nothing." *Id.* at 805. Although "no separately stated consideration was paid for those claims, . . . all claims related to policy charges, necessarily including modal-billing claims, were released." *Id.* The Court continued:

> The release of the [modal-billing] claims was one of a series of benefits conferred on the defendant by the class as part of the settlement. On the other side, defendant conferred benefits on the plaintiff class, including a monetary settlement, from which the plaintiff in this case

has benefitted . . . . No part of the consideration on either side is keyed to any specific part of the consideration of the other. Each side gives up a number of things. This is the way settlements usually work.

*Id.*; *see also* R. Doc. 1622, at 61 (¶ 131); Add. 61 (quoting same).

So too here. As the district court noted, "every negotiation has two sides, and Plaintiffs made the reasonable judgment that . . . releasing claims arising from the same conspiracy was 'a proper thing to give up to obtain these benefits.'" R. Doc. 1622, at 61–62 (¶ 132); Add. 61–62 (brackets omitted) (quoting *General American*, 357 F.3d at 805). Accordingly, a release of all claims that could be asserted by sellers, including claims they could have asserted based on their conduct as buyers, was "'part of the consideration necessary to obtain one of the largest antitrust settlements in history.'" R. Doc. 1622, at 62 (¶ 132); Add. 62 (brackets omitted) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir. 2005)).

Those considerations support the district court's overruling of Wang's objection regardless of whether buyers are properly characterized as direct or indirect purchasers of broker services. In any event, Wang's argument that buyers are direct purchasers, Br. 26–31, is mistaken. His contention contradicts the district court's express finding that *sellers* rather than buyers pay brokers, *see* R. Doc. 1622, at 62 n.16; Add. 62; R. Doc. 1601, and the factual record evincing that buyer-broker commission rates are negotiated between sellers and seller-brokers, *see, e.g.*, R. Doc. 1019, at 12 (citing R. Doc. 932-20, at 3; R. Doc. 932-21, at 4), and that sellers' listing

agreements provide for a single commission that is paid by the seller to the seller-broker and then split by the seller-broker with the buyer-broker, *see id.*; *see also* R. Doc. 38, at 14 (¶ 42); R. Doc. 1019, at 12–13 (citing R. Doc. 963-73, at 8; R. Doc. 964-118, at 4). Those features of real estate transactions are familiar, and other courts have likewise rejected the buyer-as-direct-purchaser theory that Wang advances here. *See, e.g.*, *Davis v. Hanna Holdings, Inc.*, 2025 WL 845918, at *12 (E.D. Pa. Mar. 18, 2025); *Leeder v. NAR*, 601 F. Supp. 3d 301, 309–11 (N.D. Ill. 2022).

If Wang believes his buyer claims are more valuable than the seller claims for which he is obtaining relief through the settlement, he—like any other objector—could have opted out of the settlement. This Court relied on this reasoning in *Keil v. Lopez*, 862 F.3d 685 (8th Cir. 2017), when an objector challenged the settlement on the ground that it purportedly failed to account for certain relatively stronger claims. *Id.* at 698–99. The Court noted that "it is an inherent feature of the class-action device that individual class members will often claim differing amounts of damages," but "the fact that the settlement agreement did not account" for such differences "does not render it unfair." *Id.* at 700 (cleaned up). The Court added that "there is a well-established remedy that any class member may elect to preserve what he believes to be a claim worth more than what he may receive under the settlement—opt out." *Id.* (citation omitted). Similarly, in *Marshall*, this Court

explained that a settlement was not unfair simply because there were allegedly some "individuals who by settling were giving up the greatest potential direct financial payout."  787 F.3d at 513.  The Court emphasized that such objectors "were not required to forgo what they believed to be meritorious claims" by joining the settlement class.  *Id.*  Like the objectors in those cases, Wang "could have opted out of the settlement to pursue [his] own claims."  *Id.*

Finally, to the extent Wang challenges wholly distinct conduct—*e.g.*, that NAR allegedly prohibited seller-brokers from receiving offers from buyers without brokers, Br. 33, 36—the district court correctly noted that Wang "does not cite to any rules reflecting such a prohibition."  R. Doc. 1622, at 72 (¶ 153), Add. 72.

## B.    The Opt-In Release Terms Are Clear And Unambiguous

Wang argues that Paragraph 18(d) of the settlement—providing for the release of claims against non-NAR MLSs if they satisfy certain conditions—is ambiguous.    Br. 68–75.[6]    Because Wang never raised this objection to

---

[6]   Paragraph 18(d) defines "Released Parties" to include

[a]ny non-REALTOR® MLS, including its respective past and present, direct and indirect, subsidiaries, predecessors, successors (all as defined in SEC rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), and all of their officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, but only if that non-REALTOR® MLS (i) complies with

Paragraph 18(d) in the district court, this Court need not consider it. *See UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 865 (8th Cir. 2017). In any event, neither of Wang's contentions—that Class members cannot know which entities have opted into the settlement, and that NAR intends to use the "ambiguity" as a "honey-trap" to "hold leverage over dissident brokers and fend off future lawsuits from them," Br. 68–75—has any merit.

First, nothing in Paragraph 18(d) is ambiguous. The only ambiguity Wang purports to identify in Paragraph 18(d) is its provision for "brokers and local MLSs [to] opt into the settlement and be released" if they "[make] payments and [agree to] a waiver of claims against NAR." Br. 70–71. He appears to suggest that the release is "ambiguous" because it permits entities to be released if they satisfy certain criteria but does not specify exactly which entities are being released. This argument confuses conditionality with ambiguity. Wang does not suggest there is anything

—————————

the procedures and requirements reflected in Paragraph 67 of this Settlement Agreement; (ii) complies with the practice changes reflected in Paragraph 68 of this Settlement Agreement and agrees to provide proof of such compliance if requested by Co-Lead Counsel; (iii) does not assert any claims, in the time period specified in Paragraph 59, they may have against the National Association of REALTORS®, any REALTOR® Member Boards, or any REALTOR® MLS based on any or all of the same factual predicates for the claims alleged in the Actions or the practice changes in this Settlement Agreement; and (iv) pays the Settlement Class pursuant to the procedures in Appendix D.

R. Doc. 1458-1, at 15–16 (¶ 18(d)).

ambiguous about whether an entity is released if it satisfies the criteria, nor that the criteria themselves are ambiguous. The settlement released non-NAR MLSs from liability if and only if they agreed to the requirements listed in Paragraph 18(d), none of which are vague or otherwise unclear.

Nor can it be reasonably asserted that Paragraph 18(d)'s conditionality misleads Class members or deprives them of notice. The release provided clear notice to Class members that certain non-parties could opt into the settlement as long as they satisfied the specified conditions. Just because the settlement does not list the names of the parties does not render it ambiguous. As Wang concedes, "[g]eneral releases often include unnamed parties," Br. 68, and this Court has upheld settlements with releases that clearly include unnamed parties, *e.g.*, *Douglas v. U.S. Tobacco Co.*, 670 F.2d 791, 794–95 (8th Cir. 1982).

Regardless, the list of opt-ins *was* available to Class members during the relevant period. The deadline for non-NAR MLSs to opt in was June 18, 2024, *see* R. Doc. 1458-1, at 43 (¶ 67), and JND updated the settlement website with a list of non-NAR MLSs opting in on July 21, 2024, R. Doc. 1595-7, at 12–13 (¶ 42). The deadline for Class members to opt out was October 28, 2024, more than three months later. R. Doc. 1595-7, at 72.

Finally, Wang's "honey-trap" argument is baseless. Wang alleges that Paragraph 18(d) aimed to prevent "dissident brokers" from suing NAR. Br. 71–72.

But (1) the provision does not apply to brokers; it applies to MLSs; (2) Wang does not explain why brokers would "want[] to take a swing at" NAR, Br. 71; and (3) apart from another unsupported invocation of "ambiguity," Br. 72, Wang does not explain how this provision undermines the settlement in any way.

### C.     Wang's Objections To The Practice Changes Are Misplaced

Wang asserts that the settlement's practice changes sanction illegal conduct by permitting brokers to require that buyers hire buyer-brokers.  Br 48–50.  But as the district court noted, nothing in NAR's rules requires such conduct, R. Doc. 1622, at 72 (¶ 153); Add. 72, and Wang's allegations of misconduct by some seller-brokers in North Carolina—even if true—do not explain how NAR is implicated in such conduct, Br. 48–50.

In addition, Wang's concerns about implementation and enforcement of the practice changes are speculative and premature.  *See* Br. 50–56.  There are multiple enforcement mechanisms in the agreement.  Not only can Class counsel ask for proof of compliance from NAR or any opt-in entity, but any Class member can do so as well.  *See* R. Doc. 1458-1, at 14–19 (¶ 18).  Moreover, the district court retains jurisdiction over the settlement's enforcement and implementation, R. Doc. 1458-1, at 51 (¶ 82); *see* R. Doc. 1674, at 3, and both the district court and the Class members can enforce it against most of the major MLSs and over a dozen large brokerages across the country, in addition to the several hundred opt-in entities.

### D. The Settlement Notice Was Legally Sufficient

Wang raises multiple objections to the notice program for the settlement, arguing that it was legally inadequate and thus an abuse of discretion for the district court to approve the settlement. Br. 56–68. All of these objections fail.

First, Wang claims that the notice program failed to make a reasonable effort to identify and send direct notices to all Class members. Specifically, he criticizes JND for allegedly reaching only "13 million out of the possible 51 million class members" and not obtaining "the names and contact information of class members from the settling defendants." Br. 60–61; *see also* R. Doc. 1633, at 5 (accusing JND of "cooking numbers"). He also contends that neither he nor anyone in his social circle reported receiving a direct notice. Br. 59.

Wang's unsupported anecdotes are belied by the math. JND obtained contact information from NAR, other Defendants, and various third parties, and sent out far more than 14 million direct notices. *See* R. Doc. 1595-7, at 3–4, 6–7 (¶¶ 3, 16, 19–21). As the district court noted, around 40 million direct notices were sent to potential Class members. *See* R. Doc. 1622, at 3 (¶ 2); Add. 3; R. Doc. 1595-7, at 6–7 (¶¶ 16, 19). In his calculation, Wang appears to have ignored the nearly 26 million direct notices that JND sent through e-mail, *see* R. Doc. 1595-7, at 6 (¶ 16); *see also* Fed. R. Civ. P. 23(c)(2)(B) ("The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means.").

Wang thus provides no competent evidence that JND failed to make the reasonable effort Rule 23 requires.  *See* Fed. R. Civ. P. 23(c)(2)(B).

Wang's assertion that there are "51 million" potential class members is unfounded, and based on his multiplying NAR's reported sales of 5.13 million homes in 2022 by ten to reach "51 million home sales reported by NAR" over the "ten-year class eligibility period."  Br. 56, 58.  But even if there were 5.13 million home sales every year for ten years, and each sale was to a unique person—neither of which is true—the class eligibility period only spanned ten years for homes in the *Burnett* MLSs.  *See* R. Doc. 1622, at 4–5 (¶ 8); Add. 4–5.  For all other MLSs, the eligibility period was five to nine years.  *Id.*  Accordingly, the total number of potential Class members is likely closer to the nearly 40 million direct notices that JND sent out.

Wang's anecdotal (and unattested) experiences of himself and his friends and family, Br. 59, fare no better under scrutiny.  Any such "evidence" is insufficient basis to demonstrate lack of notice, especially given the deference owed to the district court's finding that JND's direct notice program was adequate and "the best notice practicable."  *See* R. Doc. 1622, at 3 (¶ 5); Add. 3; *Rawa*, 934 F.3d at 868–69 (rejecting class action objector argument "that the [district] court's use of 'grossly inaccurate figures' led it to misjudge the overall value of the settlement" because objector "fails to show that these figures are flawed and is unconvincing that the

court should have based its analysis on pre-notice market research estimates rather than a simple, evidence-based calculation").

Second, Wang contends that the notice program violated Class members' due process rights by requiring mailed-in opt-outs or objections. Br. 65–67. Specifically, he claims that the cost to a Class member of mailing in an opt-out or objection—postage and stationery—is overly burdensome given a likely recovery of "only $8." Br. 65–66. As a threshold matter, Wang's comparison between the cost of opting out and a Class member's likely recovery through the settlement is inapt because the purpose of opting out is to *forgo* recovery under the settlement. In any event, as the district court observed, courts have frequently allowed class settlement notice programs requiring mailed-in opt-outs or objections. *See* R. Doc. 1622, at 75–76 (¶ 163); Add. 75–76 (collecting cases); *In re TikTok, Inc., Consumer Priv. Litig.*, 565 F. Supp. 3d 1076, 1093 (N.D. Ill. 2021) ("[C]ourts have routinely enforced the requirement that class members individually sign and return a paper opt-out form as 'vital' to ensuring 'that the class member is individually consenting to opt out.'") (citations omitted); *Stuart v. State Farm Fire & Cas. Co.*, 332 F.R.D. 293, 300 (W.D. Ark. 2019) (same). And ultimately, JND did accept opt-outs sent via e-mail. R. Doc. 1595-7, at 14 (¶ 57).

Finally, Wang argues that the above alleged deficiencies "artificially depressed" the number of opt-outs and objectors, and the district court was thus

wrong to rely on those low numbers in support of approval. Br. 67–68. But no such

deficiencies exist; the successful notice program did not hide potential opposition to

the settlement; and the district court correctly considered the "minimal" amount of

opposition. R. Doc. 1622, at 14 (¶ 31); Add. 14; *see* Section I.C, *supra*.

### E. Wang's Objections Related To Race And National Origin All Fail

Throughout his brief, Wang makes several arguments alleging discrimination

or lack of representation on the basis of race or national origin. These arguments are

entirely unsupported.

First, Wang asserts without evidence that members of racial minority groups

and first-generation Americans are more likely to participate in the residential real

estate market primarily as home buyers rather than home sellers. Br. 44–47.

Because the settlement does not cover the claims of those who have only bought a

home, he argues that it discriminates on the basis of race and national origin. Br.

45–46. Yet as discussed above, the settlement does not release claims of individuals

who have only bought a home. R. Doc. 1622, at 62 n.16; Add. 62; *see* Section II.A,

*supra*. And as the district court found, *see* R. Doc. 1622, at 72 (¶ 155); Add. 72, the

settlement treats all class members equitably, regardless of race or national origin.

Moreover, Wang has presented no evidence to either the district court or this Court

supporting his assertions about the settlement's disparate impact on protected

groups. *See* R. Doc. 1622, at 72 (¶ 155); Add. 72 (district court recognizing the

absence of evidence); *Pierce v. Marsh*, 859 F.2d 601, 604 (8th Cir. 1988) (rejecting claim of disparate impact "rest[ing] on mere conjecture").

Second, Wang argues that the Class representatives were not adequate because there was "little representation of racial and ethnic minorities among them." Br. 45. But nothing in Rule 23(a)(4) imposes race-based requirements for class representatives based on the diversity of the class at large. Race is only conceivably relevant to the make-up of the class representatives when the class action *itself* concerns race. *See, e.g.*, *Sullivan v. Winn-Dixie Greenville, Inc.*, 62 F.R.D. 370, 375 (D.S.C. 1974) (employment discrimination). This Class includes tens of millions of members living across the country, race was not alleged to play any role in the claims, and no evidence regarding the relevance of race to this suit was adduced at trial. The adequacy of representation is simply not implicated by the race of the Class representatives.

Finally, Wang claims that the notice program was insufficient because it was "designed not to reach Asian-American class members and in fact did not reach them." Br. 62. Wang contends that JND did not advertise on "any Asian-language newspaper, websites or other outlets," and emphasizes that, of the few objectors and opt-outs, only three have "Asian names." Br. 63–64. He also cites two out-of-circuit opinions approving notice programs aimed to reach members of racial minority

groups.  Br. 64 (citing *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007);

*Pigford v. Veneman*, 355 F. Supp. 2d 148 (D.D.C. 2005)).

Wang's race-based objection to the notice program fails.  The notice program

was a great success, *see* Section II.D, *supra*, and JND was not required to advertise

in the specific publications that Wang references, particularly given that the notice

program reasonably aimed at publications with wide circulation.  *See* R. Doc. 1595-

7, at 10 (¶ 34).  On an absolute basis, there were very few opt-outs or objectors, *see*

R. Doc. 1595-7, at 15 (¶¶ 56–57), so Wang's argument about the lack of prevalence

of "Asian names" among objectors and opt-outs is unpersuasive.  Further, Wang's

cited cases involved classes composed wholly of members of racial minority groups,

so it was not unreasonable for their notice programs to advertise in certain targeted

publications.  *See DeHoyos*, 240 F.R.D. at 276; *Pigford*, 355 F. Supp. 2d at 150–51.

This Court has upheld the approval of multiple nationwide class settlements which

used notice by publication without targeting the kinds of specific-language outlets

that Wang references.  *See, e.g.*, *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,

396 F.3d 922, 934 (8th Cir. 2005) (approving notice program described in Ex. 1 to

Joint Motion for Order Granting Preliminary Approval of Class Action Settlement

at 22–23, *Blando v. Nextel Retail Stores*, No. 02-cv-921 (W.D. Mo. Oct. 3, 2003));

*Rawa*, 934 F.3d at 865 (approving notice program described in Ex. 3 to

Memorandum in Support of Consent Motion for Settlement Approval at 6–10, *Rawa*

*v. Monsanto Co.*, No. 17-cv-1252 (E.D. Mo. Oct. 4, 2017)). The district court permissibly upheld the settlement's notice program—and the settlement overall—here as well.

## CONCLUSION

The Court should affirm the district court's approval of the settlement.

Respectfully submitted.

DATED: April 24, 2025

By  /s/ Christopher G. Michel
Christopher G. Michel
William A. Burck
Michael D. Bonanno
Rachel G. Frank
Samuel Heavenrich
QUINN EMANUEL URQUHART &
   SULLIVAN LLP
1300 I Street NW
Suite 900
Washington, DC 20005
(202) 538-8000

John F. Bash
Owen Smitherman
QUINN EMANUEL URQUHART &
   SULLIVAN LLP
300 W. Sixth Street
Suite 2010
Austin, Texas 78701
(737) 667-6100

*Counsel for Defendant-Appellee National Association of REALTORS®*

# CIRCUIT RULE 28A(h) CERTIFICATION

This response complies with Circuit Rule 28A(h) because it is submitted electronically through CM/ECF as a single PDF file that has been scanned for viruses and is virus-free.


/s/  Christopher G. Michel
Christopher G. Michel

*Counsel for Defendant-Appellee National Association of REALTORS®*

**CERTIFICATE OF COMPLIANCE**

1.  This response complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

2.  This filing complies with the type-volume requirements of Fed. R. App. P. 32(a)(7)(B)(i) because the word count is 10,252 words, excluding the portions exempted by Fed. R. App. P. 32(f).


*/s/  Christopher G. Michel*
Christopher G. Michel

*Counsel for Defendant-Appellee National Association of REALTORS®*

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 24, 2025, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


*/s/  Christopher G. Michel*
Christopher G. Michel

*Counsel for Defendant-Appellee National Association of REALTORS®*